ELLIOTT *v.* MASSEY.

No. 41996 November 6, 1961 134 So. 2d 478

*Shumate & Eppes,* Meridian, for appellant.

*Dunn* & *Singley,* Meridian, for appellee.

162

JONES, J.

This was a suit for damages for personal injuries.

At Meridian, Grandview Avenue runs generally north and south, evidently along a ridge. Country Club Boulevard runs generally east and west and on the Boulevard it is up-hill from either direction to Grandview Avenue. Grandview is approximately 30 feet wide and the Boulevard is approximately 27 feet wide. The automobile collision involved herein occurred approximately two to five feet northwest of the center of the intersection. Miss Massey, the appellee, approached Country Club Boulevard from the north on Grandview Avenue. She and her companion and another witness testified that she stopped at the stop sign on Grandview and after seeing no cars approaching from either direction started across it at a slow speed and appellant Elliott's car struck her car on the left side between the front wheel and the door. Appellant estimated his speed at 20 to 25 miles per hour at the time of the accident and he and his witness testified that Miss Massey did not stop at the intersection. Of course, the facts are controverted, the number of witnesses being about evenly divided.

The jury returned a verdict for the appellee in the sum of $15,000.

Motions to exclude and for a peremptory instruction were properly refused.

 The evidence was ample to sustain a verdict of liability.

Complaint is made as to certain instructions, but having considered all the instructions granted both the plaintiff and defendant, there is no doubt that the issue

as made by the pleadings and the evidence was fairly and correctly presented to the jury.

Appellant contends that it was impossible, coming from the east, to see a car approaching on Grandview except for a few feet before it reached the intersection. He himself introduced in evidence a photograph of the intersection purporting to be a representation of Country Club Boulevard looking west toward the intersection as it appeared on the day on which the accident took place. He also introduced a photograph looking east toward the intersection from the west thereof. Those pictures disclosed the alleged obstructions.

Appellant complains of the admission of the testimony of one of the police officers that, a short while before the trial (which was had nearly two and one-half years after the accident), he had gone to the scene and made experiments to see how far a car coming south on Grandview could be seen as it approaches the intersection. The tests were from different distances on Country Club Boulevard east of the intersection. He testified that practically all the trees in the northeast corner of the intersection were pine and that except for additional stop signs and the difference in foliage (the accident happened in July and witness made his observations in December) the conditions were the same.

Objection to the admission of this testimony was made and overruled by the court. Later appellant introduced the lady who lived in the house on the northeast corner. She testified that about a month before the trial her trees had been trimmed and that some of the trimmings was of limbs as near as seven feet to the ground. She also testified that there were dogwood and mimosa trees in the southwest corner of her lot which had foliage in July and none in December.

This Court, in Brown v. State, 176 Miss. 448, 169 So. 837, speaking through Judge Griffith, said:

"Many courts have shown considerable reluctance in admitting what is called in the books 'experimental evidence,' and have said that such evidence should be received with great caution. But the modern tendency is to receive such evidence, when the comparative conditions are such as to be substantially the same in regard to the particular issue in question. It is not required that all the conditions shall be precisely reproduced; but it is sufficient if they are so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the tests are directed. As said in Harrison v. Railway Co., 93 Miss. 40, 46 So. 408, the circumstances of the tests or experiments must be (1) identical, or (2) nearly identical, with those with which the experiments are sought to be compared; and all the authorities are to the effect that these questions are largely within the sound discretion of the trial judge, and that the only effect of a variation between a precise and a substantial reproduction is as to the weight of the experimental evidence rather than its admissibility.

"It seems to us that the probabilities are so strong in favor of the affirmative that the experiments or tests in this case were made under substantially similar conditions, so far as were material to the particular issue in hand, that the trial judge cannot be held to have abused his discretion in admitting the evidence. If the requirements of the rule were that all conditions must be, without doubt, so perfectly identical that the result would amount to an irrefutable demonstration, it would mean that experimental evidence would largely disappear as a practical method of proof; for it is impossible in most cases to precisely reproduce all conditions or to show with absolute certainty that all conditions have been precisely reproduced. The rule must be allowed an operation within what is reasonably fair and practicably possible according to the probative probabilities, without

requiring absolute precision or certainty either as to comparative conditions or the proof thereof.''

In 20 A.M. Jur. 611, relative to photographs, it is said: ''Photographs of the scene of an accident taken at or near the time are not always obtainable, and the only practical rule would seem to be that the changes must not be such as to destroy the substantial identity and that the changes, whatever they may be, should be carefully pointed out and brought to the jury's attention.''

The jury had before it the officer's testimony which was to be considered in connection with the evidence as to the trimming of the limbs and also in connection with the pictures. It was not controverted that the pictures fairly represented the appearances at the intersection on the day of the accident. We do not think the lower court abused its discretion in admitting this testimony of the officer and that under all the facts and circumstances the jury could not have been misled, they being the determiners of its weight.

Appellant complains of the amount of the verdict, alleging that it is so excessive as to evidence bias, passion and prejudice on the part of the jury. This question was raised in a motion for a new trial which was overruled by the lower court. No comparative negligence instruction was requested. Plaintiff testified that she received a knot over her left eye and was nauseated all of the night after the accident. It was the next morning before she went to see a doctor, who immediately put her in the hospital. She had a severe pain in her neck, head and shoulders. She was given medication by mouth, some shots, and her head was placed in traction, where it remained for a week, after which she wore a cervical collar. She was in the hospital sixteen days. She continued under treatment by Dr. Anderson. He sent her to Dr. Galbraith, a neurologist in Birmingham. She also took treatments from Mr. Miller, a physical therapist. He treated her for six weeks or two months. After she left

the hospital, she wore the cervical collar while up, except when working, for about ten months. She was employed by the telephone company and when she returned to work about two and a half months after the accident, they would not let her wear the collar during working hours, but she did wear it at other hours when she was out of bed. This continued for about ten months, and for about eight months she slept in traction at home, using an appliance supplied by her doctor. The trial was in December 1960, nearly two and a half years after the accident. She testified she still had severe headaches, and that sometimes they were constant for a week or two at the time. She lost wages in the sum of approximately $700, and her hospital and doctors bills were between $800 and $900. The doctors gave no prognosis as to how long she would suffer. Dr. Galbraith reported that "ultimate recovery anticipated." On the trial of the case, Dr. Anderson testified that he agreed with this prognosis, but no time of recovery was fixed and he indicated that this prognosis was more or less "hopeful." In September 1960, Dr. Anderson certified to the telephone company that Miss Massey's condition was such as to permit her to be transferred to Florida.

The jury had all of this evidence before it, particularly the fact that the plaintiff was still suffering at the end of two and one half years; that while her ultimate recovery was anticipated, no time therefor was fixed.

The verdict is probably more than we on the Court would have given; however, with the direct evidence of pain for two and one-half years and the doubtful prognosis as to when she would fully recover, we cannot say that the verdict is so grossly excessive as to evidence bias, passion and prejudice, or to shock the conscience. The case is therefore affirmed.

Affirmed.

*Lee, P. J.,* and *Arrington, McElroy,* and *Rodgers, JJ.,* concur.